UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Terrence Sampson,<br><br>    Plaintiff,<br><br>- against -<br><br>International Union of Operating Engineers Local 14 and 14B<br><br>    Defendant. | CV   (  )(  )<br><br>Complaint and Jury Demand |

Plaintiff, by his attorney, Michael G. O'Neill, for his complaint, alleges as follows:

1. This is an action to remedy race discrimination in employment against plaintiff by a powerful labor union in the construction industry in New York City.

2. Jurisdiction is by virtue of 28 U.S.C. §1331, 28 USC §1343, 28 U.S.C. §1367, 42 USC §1981 and 42 USC §2000e et seq.

3. Venue is proper because defendant International Union of Operating Engineers Local 14 and 14B (the "Union," "Local 14" or "defendant") is a resident of the Eastern District of New York.

4. Plaintiff is African American.

5. Local 14 is a Labor Organization within the meaning of 42 USC §2000e(d).

6. Local 14 is the collective bargaining representative of a class of workers who operate various types of heavy equipment in the construction industry within New York City, including Cranes, Excavators, Bulldozers and related categories of equipment.

7. The individuals represented by Local 14 are known in the industry as

"Operating Engineers."

8.  During all relevant times, plaintiff has been an Operating Engineer and a members of Local 14.

9.  There is no licensing of Operating Engineers per se, and no license is required to operate most of the equipment operated by Operating Engineers.

10. There is a long history of discrimination against African Americans in the construction industry.

11. Despite previous attempts at eradicating the effects of past discriminatory practices, the membership of Local 14 remains predominantly non-African American.

12. The vast majority of Local 14 members are non-African American.

13. The wages of Operating Engineers are usually the highest at any given construction site.  Base hourly rates range from $35 on the low end up to over $75 on the high end, depending on the type of equipment operated.  Night, weekends, holidays and overtime hours are paid at premium or double time.  The value of benefits is about 50 percent of the base wage rate.

14. Contractors rarely hire Operating Engineers directly.  For the most part, contractors rely on defendant to assign Operating Engineers to their construction projects.

15. Defendant operates what it calls a "referral hall."

16. Ostensibly, the purpose of the referral hall is for out of work Operating Engineers to assemble and be referred by defendant to job openings reported by

contractors.

17.  As a practical matter, however, most Operating Engineers never report to the referral hall but obtain jobs from defendant by other means.

18.  This is especially true for the best jobs, which are multi-year jobs at large construction projects.

19.  An example of such a project is the rebuilding of LaGuardia Airport. This project began in 2016 and is not expected to be completed until at least 2022.

20.  An Operating Engineer working on this project full time could enjoy uninterrupted employment earning between $200,000 and $300,000 per year.

21.  The job assignment system operated by Local 14 is entirely rigged.

22.  The premium jobs, that is to say, the jobs on long term construction projects, do not appear suddenly or randomly.

23.  A large construction project involves a lot of planning. The contractor knows weeks, sometimes months, in advance when actual construction will start and when Operating Engineers will be needed at the worksite.

24.  Furthermore, the contractor knows with some accuracy how long the construction project will last.

25.  In order to request Operating Engineers from Local 14, the contractor calls the Business Representative assigned to the region where the construction project is taking place.

26.  The contractor informs the Business Representative what machines will need Operating Engineers, when the work will start, and how long the work will last.

27. The Business Representative will then plan which Operating Engineers are to be assigned to these projects.

28. There are at least three ways that the Business Representative can ensure that a particular Operating Engineer is assigned to a particular job.

29. The first and most blunt approach is simply to instruct the contractor to request the Operating Engineer by name. This creates a record that makes it appear that the contractor and not the Union made the decision to hire the Operating Engineer in question.

30. Second, the Business Representative can hold the job request until the Operating Engineer he wants to obtain the job is the next Engineer to be assigned at the Referral Hall.

31. Third, the Business Representative can assign the Operating Engineer directly to the job and bypass the Referral Hall altogether.

32. The communications between contractors and Business Representatives is always by phone or in person. There is no system for keeping track of when or how contractors request Operating Engineers. In this manner, the timing and filling of requests for Operating Engineers can be manipulated to suit the purposes of the Business Representatives and Local 14.

33. Every construction job comes to an end eventually. In theory, this would mean that every Operating Engineer becomes unemployed at one time or another.

34. There are tricks and techniques used by Local 14 to ensure that certain Operating Engineers have the most continuity of employment.

35. For example, a three year job may have five or six months left of work. At that time, a new project comes online that is planned to last at least two years. The Operating Engineer at the job that is winding down will be told to quit that job, and shortly thereafter (if not immediately) he will be assigned to the new project, thus ensuring uninterrupted employment for two more years.

36. Union's by-laws require Operating Engineers to report the starting and stopping of all employment.

37. Thus, at any given time, the Union knows who is employed and who is available for employment.

38. Due to the manner in which the industry operates, out of work Operating Engineers have no way of knowing what specific jobs are available.

39. That information is typically known only to the Union's Business Agents.

40. Operating Engineers who wish to be referred to jobs by the Union are supposed to sign in at the referral hall operated by the Union.

41. The act of signing in at the referral hall is the functional equivalent of applying for employment for any available jobs within the skill set of the Engineer.

42. Plaintiff is qualified to operate all machines within Local 14's jurisdiction except cranes.

43. Like most Operating Engineers, plaintiff is dependent upon the Union to be assigned jobs, and hence, his livelihood.

44. During all relevant times, the Union has discriminated against plaintiff

in the assignment of jobs on account of his race.

45. Plaintiff has never been assigned by the Union to a multi-year job at a major construction site.

46. During the same period, numerous similarly situated non-African Americans have been assigned by the Union to a multi-year job at a major construction site.

47. Plaintiff is not assigned work by business agents without having to sign in at the referral hall.

48. During the same period, numerous similarly situated non-African Americans have been assigned work by the Union without having to sign in at the referral hall.

49. Since jobs at the referral hall are supposedly assigned on a first come, first serve basis, plaintiff arrives at the referral hall hours before it opens at 6:00 a.m.

50. Often, plaintiff arrives the night before and sleeps in his car in order to be the first to sign in at the referral hall and enhance his chance of being assigned work.

51. Despite being one of the first, if not the first, Operating Engineer to sign in at the referral hall, plaintiff is almost always assigned jobs on low paying machines or short term jobs, while non-African American Operating Engineers who sign in after plaintiff are assigned better jobs.

52. Plaintiff has been an outspoken critic of Local 14's discrimination against him and against other African American Operating Engineers.

53. Plaintiff has criticized and opposed Local 14's discriminatory practices

by confronting Local 14's business agents and protesting their discriminatory assignment of jobs.

54. Plaintiff has also participated in administrative and judicial proceedings alleging race discrimination on the part of Local 14.

55. For example, plaintiff was a listed witness in an action in the United States District Court for the Eastern District of New York entitled "Morrison et al. v. Local 14, 12 cv 301 (FB)."

56. Plaintiff filed a charge of discrimination with the United States Equal Opportunity Commission ("EEOC") on or about June 22, 2017.

57. Since filing his charge of discrimination, plaintiff has experienced an increase in the discriminatory practices complained of herein.

58. In addition, upon information and belief, defendant is enlisting contractors to find fault with plaintiff's work and to request that he not be assigned to their job sites.

59. On about July 26, 2019, the EEOC issued its right to sue letter to plaintiff.

60. Plaintiff has satisfied all conditions precedent to bringing this suit.

61. This suit is timely filed.

62. The discriminatory practices complained of herein continue to this day.

63. Unless this Court orders Local 14 to implement a system for assigning jobs to Operating Engineers that cannot be manipulated, the discriminatory practices complained of herein will continue into the future, to the detriment of plaintiff and

other African American Operating Engineers.

### *First Claim*

64. Local 14 has discriminated against plaintiff on account of his race in the assignment of jobs in violation of 42 U.S.C. §2000e et seq.

65. By virtue of the foregoing, plaintiff has suffered damages.

### *Second Claim*

66. Local 14 has discriminated against plaintiff on account of his race in the assignment of jobs in violation of 42 U.S.C. §1981 et seq.

67. By virtue of the foregoing, plaintiff has suffered damages.

### *Third Claim*

68. Local 14 has discriminated against plaintiff on account of his race in the assignment of jobs in violation of the New York City Human Rights Law.

69. By virtue of the foregoing, plaintiff has suffered damages.

### *Fourth Claim*

70. Local 14 has retaliated against plaintiff for opposing Local 14's discriminatory employment practices and for participating in administrative and legal proceedings, in violation of 42 U.S.C. §2000e et seq.

71. By virtue of the foregoing, plaintiff has suffered damages.

### *Fifth Claim*

72.     Local 14 has retaliated against plaintiff for opposing Local 14's discriminatory employment practices and for participating in administrative and legal proceedings, in violation of 42 U.S.C. §1981 et seq.

73.     By virtue of the foregoing, plaintiff has suffered damages.

### *Sixth Claim*

74.     Local 14 has retaliated against plaintiff for opposing Local 14's discriminatory employment practices and for participating in administrative and legal proceedings, in violation of the New York City Human Rights Law.

75.     By virtue of the foregoing, plaintiff has suffered damages.

**WHEREFORE**, plaintiff demands judgment for all relief permitted by law, including but not limited to:

 a      Awarding plaintiff money judgment for his damages, including but not limited to lost wages, lost benefits, front pay, other economic damages, shame, humiliation, embarrassment and mental distress;

 b      Awarding plaintiffs punitive damages;

 c      Awarding plaintiffs attorneys' fees;

 d      Awarding pre-verdict, post-verdict and prejudgment interest and costs;

 e      Granting preliminary and permanent injunctive relief by ordering Local 14 to adopt a job assignment system that is not susceptible to manipulation and by enjoining Local 14 from engaging in the discriminatory practices

complained of herein;

f    Granting such further and additional relief as the Court deems just and appropriate under the circumstances.

Dated: New York, New York  
     August 29, 2019

MICHAEL G. O'NEILL

*/s/ Michael G. O'Neill*

_____  
Attorney for Plaintiff  
30 Vesey Street, Third Floor  
New York, New York 10007  
(212) 581-099

# Jury Demand

Plaintiff demands trial by jury on all issues.

Dated: New York, New York  
     August 29, 2019

MICHAEL G. O'NEILL

*/s/ Michael G. O'Neill*

_____  
Attorney for Plaintiff  
30 Vesey Street, Third Floor  
New York, New York 10007  
(212) 581-0990