**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

TERRENCE SAMPSON,

             Plaintiff,

-against-

INTERNATIONAL UNION OF OPERATING
ENGINEERS LOCAL 14 AND 14B,

             Defendant.

Case Nos.

22-CV-3588 (DG)(LKE)
19-CV-4946 (DG)(LKE)

---

**DEFENDANT INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 14-14B'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS *DAUBERT* MOTION**

---

**FORDHARRISON LLP**
366 Madison Ave, 7th Floor
New York, NY 10017
(212) 453-5900
*Attorneys for Defendant*

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................ 1
    I.    DR. THOMPSON'S NEW AFFIDAVIT IS A SHAM........................................................... 1
    II.   DIFFERENCE BETWEEN DISPARATE TREATMENT AND DISPARATE IMPACT .. 5
    III.  OMITTED VARIABLE BIAS................................................................................................ 7
    IV.  AUTHENTICITY .................................................................................................................... 9
CONCLUSION............................................................................................................................... 10

# TABLE OF AUTHORITIES

Page(s)

Cases

*Hayes v. New York City Dep't of Corr.*,
  84 F.3d 614 (2d Cir. 1996) ................................................................................................... 2

*In re Fosamax Prod. Liab. Litig.*,
  647 F. Supp. 2d 265 (S.D.N.Y. 2009) .................................................................................. 2

*Mandala v. NTT Data, Inc.*,
  975 F.3d 202 (2d Cir. 2020) ................................................................................................ 5

*Savarese v. City of New York*,
  547 F. Supp. 3d 305 (S.D.N.Y. 2021) .................................................................................. 1

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
  576 U.S. 519 (2015) ............................................................................................................ 6

*Watson v. Fort Worth Bank & Tr.*,
  487 U.S. 977 (1988) ......................................................................................................... 5, 6

## **INTRODUCTION**

In response to Plaintiff's opposition, it is vital to stress the point that evidence matters. Plaintiff's strategy in opposing Defendant's motion to preclude improper speculations made by his expert is to double down and serve *another, brand new,* affidavit from statistical expert, Dr. Thompson. Dr. Thompson's new affidavit states that it was created for the sole purpose of responding to Defendant's arguments in its *Daubert* motion. However, old habits die hard. Dr. Thompson's new affidavit fails to cite to any evidence in support of his brand new "expert" opinions, contradicts his prior testimony, and attempts to confuse the Court on what evidence exists. Concerningly, Dr. Thompson's new affidavit provides his own beliefs on the strength of Defendant's arguments, matching almost perfectly with the arguments proffered by Plaintiff's counsel in his memorandum of law. This is patently improper. First, it presents conclusory legal statements under the guise of expert testimony. Second, it is a clear attempt to create confusion in the hopes that the Court will simply "leave it to the jury." Defendant submits this reply to raise four points in response to Plaintiff's opposition. For all other points, Defendant respectfully rests on its original moving papers.

**I.     DR. THOMPSON'S NEW AFFIDAVIT IS A SHAM**

The bedrock of Plaintiff's opposition to Defendant's *Daubert* motion is a specifically crafted affidavit from Dr. Thompson that attempts to create "facts" in the case to which Plaintiff's counsel can cite. To do this, Dr. Thompson's new affidavit walks back or flatly contradicts the testimony he previously gave during two separate depositions and even his own prior reports. The Court cannot allow such a practice that attempts to re-write the evidence in this case.

The "sham affidavit doctrine" provides that a party who has been examined at length on deposition may not raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony as such conduct would greatly diminish procedures for screening out sham issues of fact. *See Savarese v. City of New York*, 547 F. Supp. 3d 305 (S.D.N.Y. 2021). The rule generally

precludes submission of an affidavit where the affidavit contradicts the declarant's prior testimony, with an exception where the later sworn assertion addresses an issue that was not, or was not thoroughly or clearly, explored in the deposition (which was not the case here). *See In re Fosamax Prod. Liab. Litig.*, 647 F. Supp. 2d 265 (S.D.N.Y. 2009). The goal of the sham affidavit doctrine is to distinguish issues of fact, highlighting that "factual issues created solely by an affidavit crafted to oppose a . . . motion are not genuine issues for trial." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

Here, Dr. Thompson's new affidavit is a sham. Dr. Thompson provided ample testimony that he did not review skips and refusals data – indeed, he was given multiple opportunities throughout each deposition to deny that he had reviewed such data. As such, any testimony on skips and refusals in his new affidavit contradicts his deposition testimony. Beyond this, paragraphs 10, 20, 31, and 41 of his new affidavit either directly contradict prior testimony or call such prior testimony into question without any evidence or explanation. For example, in Paragraph 31, Dr. Thompson states, "I don't know if defendant is seriously contending that my report assumes that job assignments are randomly given. . . . I controlled for certifications, which plainly acknowledges that the assignments are not random because they are affected by certifications."

This is a prime example of Plaintiff's attempt to muddy the facts and a blatant contradiction to his prior statements and reports. What Defendant pointed out in its motion is not whether job assignments are affected by certifications, but rather the fact that Dr. Thompson's statements and conclusions in his reports indicate that he analyzed the data under the assumption that job referrals were made randomly after accounting for certifications. Dr. Thompson clearly indicated that this is, in fact, what he assumed, both in his prior reports and even in his testimony during his deposition, despite the fact that the record consistently shows that job referrals were never made randomly even after accounting for certifications. In fact, all of Dr. Thompson's reports stress his finding of "non-randomness." *See* Exh. Q, ¶ 12 ("I conclude that the job referral process followed by the union is not random, and that the non-randomness favors White engineers"). When asked about the Union referral hall procedures governing referrals, Dr. Thompson testified, "*[I]t is*

2

*supposed to be random* based on those who have qualifications to do it." *See* Exh. K, 33:19-34:11 (emphasis added); *see* Exh. S ("In this way, under a randomized process, we would expect Mr. Sampson to have assignments that were at least good (or better) than his lessor (*sic*) certified peers. I found clear evidence to the contrary -- Mr. Sampson was an extreme outlier, receiving far worse outcomes than his peer"). Beyond this, Dr. Thompson even provides an example in his first report of picking marbles out of a jar to illustrate how randomness works and what results he would expect from the referral hall if referrals were random. This demonstrates a fatal flaw in Dr. Thompson's analysis that destroys any reliability or probative value. Instead, his analysis would only serve to confuse and mislead, and the statements in his most recent affidavit are a clear attempt to further muddy his previous statements to rectify the fact that he misapplied his testing methods.

Additionally, Paragraphs 8, 9, 13, 14, 24, 27, 28, 33, 34, 36, 40, 43, 45, 49, and footnote 1 of Dr. Thompson's new affidavit contain statements unsupported by any evidence in the record. While Defendant stressed this in its original moving papers, the illogicality of Dr. Thompson providing any testimony regarding records he swore he never reviewed cannot be overlooked. Dr. Thompson repeatedly testified that he did not review the data provided on skips and refusals. *See* Exh. K at 19:4-20:25; 46:10-48:8; 52:22-53:12; 64:15-19; Exh. L at 41:15-22; 104:7-19; 137:8-17; 138:3-10. Yet, Dr. Thompson is now trying to provide a post hoc rationale for the non-review to make it appear that the decision not to review those records was somehow reasoned. However, Dr. Thompson's prior testimony established – twice – that he never even saw those records, did not know whether Plaintiff's counsel provided those records to him, and admitted that such data may influence his statistical tests. *See* Exh. L (Q: And again, is it correct that when you did this analysis in paragraph number 48…you did not account for member refusals, member skips, correct?" A: "correct."); *see also* Exh. K (Q: "Okay. Did you take into account in your reports individuals' ability to refuse jobs?" A: "No." Q: "Okay. And why not?" A: "I used the tables that were available to me. I don't recall if I had a refusals table or not, to be honest.").

Recognizing the weight of his own concession, Dr. Thompson – or Plaintiff – crafted his new affidavit to specifically disavow such testimony or try to smooth it over. Yet the fact remains

3

that evidence critical to whether someone worked on a given day (*i.e.* whether that person refused the job) was never considered when Dr. Thompson provided his expert reports and testimony despite knowing Plaintiff did refuse jobs. *See* Exh. K (Q: "Would your analysis change if Mr. Sampson refused certain jobs for a plethora of reasons on his own?" A: "It would be new data. My guess is that he would refuse them if they were, you know, small minor jobs. I haven't reviewed it, so I don't know. But if I looked at the data, it could update my analysis"). Dr. Thompson further contradicts himself on the following topics: (1) the reliability of Local 14's data (Exh. L at 44:21-45:25); (2) whether skips and refusals data would alter his analysis (Exh. K at 19:4-20:25; 46:10-48:8; 47:13-15; 47:18-20; 64:15-19); (3) whether job assignments are randomly given (Exh. O, ¶ 40; Exh. L at 77:8-11); and (4) whether he disputed the authenticity of Local 14's records (Exh. S, ¶ 15).

Dr. Thompson's new affidavit attempts to convince the Court that only two relevant variables exist in this case: race and certifications – no others. This screams of omitted variable bias when recognizing all the variables present in obtaining work from the referral hall, the most glaring one being whether the member simply refuses work offered to them. Defendant discussed at length in its original papers how a person's choice to refuse work *is highly relevant* when assessing possible reasons why that same person did not work as much as others. For example, it is common sense that if someone is offered Job A but refuses Job A, their refusal of the job is relevant to why that person did not work Job A. However, Dr. Thompson is attempting to convince the Court that whether an individual refuses every job ever offered to them is not at all relevant. Instead, Dr. Thompson posits that including refusals in the statistical regression may "mask" the effect of "discrimination," without even testing for it. This point is lost on Defendant and is not the product of any identified scientific testing. If what Dr. Thompson is trying to say is that when refusals are considered in the regression race becomes insignificant, then he agrees with Defendant's rebuttal expert, Dr. Bradley, who made this exact finding in his rebuttal reports. The fact that race becomes an insignificant factor when Plaintiff's own decision to refuse referrals are taken into account is not a reason to exclude that factor. No one can force a person to accept work

4

– they have the choice not to and if they choose not to, this choice must be a factor when assessing possible reasons for that person not having as much work as others. It shocks common sense that Dr. Thompson would exclude a factor that may explain the disparity in Plaintiff's work as compared to others, especially because Dr. Thompson states multiple times that his "null hypothesis" is race neutral. Instead, it appears that skips and refusals data was not considered by Dr. Thompson for the simple fact that it would "hurt" Plaintiff's argument.

Beyond this, Dr. Thompson's new affidavit repeats unsupported allegations that there was "unknown" activity happening at the referral hall and that "Blacks" were offered "low quality jobs." Dr. Thompson cites no evidence in support of these statements and no evidence showing that such practices exist. Instead, this is simply a theory that Plaintiff's counsel has repeated despite having no evidence to support it. If Plaintiff believed there was evidence of any of this, he should have identified the evidence. He cannot rest on unsupported talking points to succeed after all discovery has closed.

The multitude of contradictions on topics explored at his depositions must lead to the preclusion of Dr. Thompson's new affidavit. It is a clear attempt to confuse the Court in the hopes the Court will simply leave it for the jury to decide.

## II. DIFFERENCE BETWEEN DISPARATE TREATMENT AND DISPARATE IMPACT

Plaintiff's counsel argues at length about the appropriateness of Dr. Thompson's statistical analysis; however, in doing so, he appears to be confusing the evidence necessary for a disparate impact case versus a disparate treatment case. This is a disparate *treatment* case, thus Plaintiff must meet a higher burden of proof. Disparate treatment cases require the plaintiff "to prove that the defendant had a discriminatory intent or motive." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 986 (1988). Disparate treatment claims require *intentional* discrimination while disparate impact claims do not. *See Mandala v. NTT Data, Inc.*, 975 F.3d 202 (2d Cir. 2020). "In contrast to a disparate-treatment case, where a plaintiff must establish that the defendant had a discriminatory

5

intent or motive, a plaintiff bringing a disparate impact claim challenges practices that have a disproportionately adverse effect on minorities and are otherwise unjustified by a legitimate rationale." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 524 (2015) (internal punctuation omitted). Unlike in disparate treatment cases, the evidence in disparate impact cases focus "on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 987 (1988). This is because the "factual issues and the character of the evidence are inevitably somewhat different when the plaintiff is exempted from the need to prove intentional discrimination." *Id*.

Here, Plaintiff is required to meet the higher burden of proof to prove intentional discrimination and intentional retaliation against him specifically. Dr. Thompson attempts to opine that his statistical tests alone are sufficient to establish both intentional discrimination and intentional retaliation. He does this by looking at the number of referral hall visits Plaintiff made through the years as compared to others. Yet the glaring flaw remains that Dr. Thompson failed to consider the number of times Plaintiff refused jobs, which is vital data necessary to review when assessing whether refusals impact his statistical regression model. The evidence showed that Plaintiff refused more jobs than virtually all other Union members and was an "extreme outlier," in the words of Dr. Thompson. *See* Exh Q ("I also found that Mr. Sampson was an even more extreme outlier than in my original report. Among his peers, those that are equal or lessor certified, Mr. Sampson made far more visits to the union hall and got far fewer work hours. In fact, his visit-to-work-hours ratio got almost five times worse than it was in my original report. This appears to be retaliatory action against Mr. Sampson."); *See* Exh. S ("In this way, under a randomized process, we would expect Mr. Sampson to have assignments that were at least good (or better) than his lessor (*sic*) certified peers. I found clear evidence to the contrary -- Mr. Sampson was an extreme outlier, receiving far worse outcomes than his peer"). Dr. Thompson never conducted any testing regarding whether Plaintiff himself was subjected to discrimination. Instead, Dr. Thompson appeared to conduct flawed testing that would be arguably applicable to a disparate impact

6

analysis, which is not at issue in this case.[1]  For this reason too, Dr. Thompson's reports and opinions should be precluded as they would in no way help the trier of fact with the claims here.

## III.   OMITTED VARIABLE BIAS

Plaintiff's counsel claims that Dr. Thompson's omission of letters from contractors firing and refusing to work with Plaintiff is permissible because no letters that were the same or similar were submitted for other members. He argues that "[i]t is simply impossible to conduct a regression analysis on the entire population with data for only a single person in that population," citing to Dr. Thompson's sham affidavit to make his point.

In doing this, Plaintiff adopts Dr. Thompson's new affidavit testimony, attempts to convince the Court that prior complaints from contractors about Plaintiff should not be considered, and tries to misdirect attention to Defendant for not proactively providing him with unrequested discovery.  Dr. Thompson is only a statistical expert and was not involved in document production. He lacks firsthand knowledge of what was produced in discovery, so that portion of his new affidavit should be disregarded entirely as it is not based on direct knowledge, not the product of scientific testing, and is misleading. Additionally, it is bizarre for an expert to provide such sweeping statements regarding discovery when his expertise is simply in the field of statistics. Notwithstanding, in order to make this statement, Dr. Thompson either created it from thin air or it was fed to him by Plaintiff's counsel. Regardless, the statement is a textbook red herring. This is Plaintiff's case to prosecute and Defendant is under no obligation to provide Plaintiff with such "comparator" evidence when no such discovery was requested. If Plaintiff wanted such evidence, he should have requested it in the years of discovery and, if not produced, should have sought relief from the Court during the years of discovery. He did neither.

Additionally, Plaintiff misses the point of this evidence and its relevance. Each of the contractors who refuse to work with Plaintiff represents limitations on his professional

---

[1] Defendant maintains that the reports and testing would still be fatally flawed for all the reasons discussed in Defendant's *Daubert* motion even if this were a disparate impact case.

opportunities that other Union members without such complaints do not face. The same is true for each time Plaintiff refused to accept a job referral. Both factors represent non-discriminatory limitations on Plaintiff's ability to secure work from the Referral Hall. Without considering factors that impact whether Plaintiff received work, Plaintiff is given a blank check to create a record on his own then use that record to establish a discrimination / retaliation claim. For example, without considering Plaintiff's refusals, Plaintiff is free to show up to the referral hall, refuse every job offered, create a record showing he arrived at the referral hall but left without work, and then use that created record to say "it was only because of my race that I did not secure a job referral on the days I went to referral hall." This would paint a picture that is not in line with the evidence and that would only serve to mislead the Court.

Plaintiff further pontificates on perceived problems with the skips and refusals data, specifically claiming that Dr. Bradley's analysis is "governed by the garbage in, garbage out rule" which states that poor quality input produces faulty output. Importantly, Plaintiff only makes this argument with respect to the records that do not help his case (skips and refusals), while simultaneously accepting the other records as not "garbage" because he thinks they support his allegations. Dr. Thompson exceeds his area of expertise and continues to attempt to undermine the authenticity of the skips and refusals data – data that he admitted that he did not even look at, let alone analyze – in order to justify not considering a patently relevant factor: ***member choice***. The skips and refusals data represents a host of variables, including whether a member on the referral list did not have a required license or certification for the equipment or jobsite, lacked the skill or experience necessary to perform the work for a given job request, was not physically present at the referral hall, did not answer their phone after repeated calls, or simply refused a job for any or no reason. *See* Def.'s 56.1 ¶¶ 51, 60, 61; Exh. G at 12:23; 13:6-9, 20:19-20. As an attempt to justify these omissions, Dr. Thompson operates on the assumptions that skips and refusals are arbitrary and uncontrolled, and refusals respectively indicate that black members are offered bad jobs. Dr. Thompson fails to reference any evidence to support any of those assertions and assumptions. Specifically, Dr. Thompson speculates that a member refusing a job goes against the member's

8

purpose in being at the referral hall to begin with, concluding that refusals mean the job was undesirable and that only black members are offered undesirable jobs. Dr. Thompson does not – indeed, *cannot* – offer any facts to support these claims. He does not offer an analysis on job quality, nor does he actually examine human behavior beyond making sweeping assertions during his deposition. *See* Exh. K at 46:10-48:8.

## IV.   AUTHENTICITY

Plaintiff argues in his opposition brief that Dr. Thompson has never opined on the authenticity of evidence, particularly related to the skips and refusals data. However, Dr. Thompson *has* opined on the *reliability* of evidence produced in discovery. *See* Exh. S, ¶ 15. Dr. Thompson writes, "I did not control for skips and refusals because the data provided by the Union is plainly unreliable and probably biased." Local 14 takes issue with this characterization for many reasons. The opinion that evidence is "plainly unreliable and probably biased" is completely outside the scope of Dr. Thompson's expertise as a statistician. Additionally, Dr. Thompson testified that he never looked at the data he called "plainly unreliable and probably biased." Nevertheless, this is yet another red herring, as the third-party vendor who Defendant utilizes to maintain the records produced in this case provided an affidavit explaining an error that occurred when the third-party vendor transferred data into a new program for data management. It is worth noting that the third-party vendor confirmed the transfer issue only impacted *second* copies of records Plaintiff was previously provided and did not impact records after the date of the data transfer. *See* Exh. JJ. Dr. Thompson's attempt to question the validity of the third-party vendor's explanation furthers the improperness of his new affidavit. If Plaintiff had any issue with the third-party vendor's affidavit, he should have sought discovery on that topic or at least raised it with the Court. He did neither. Instead, Plaintiff now tries to shield himself by bundling legal arguments and credibility assessments into an expert affidavit.

## **CONCLUSION**

All of the contradictions explored above show that Plaintiff's opposition to Defendant's *Daubert* motion is an attempt to throw as much speculation to the Court as possible in the hopes that the core issues addressed in Defendant's motion will be overlooked. However, as stated above, evidence matters. Dr. Thompson all but admits that his reports are the result of an assemblage of only two data sets he decided helps Plaintiff's case and an omission of all other data sets that do not support Plaintiff's claims. Further, Dr. Thompson does not reliably apply statistical analysis. In the end, Plaintiff relied on the new affidavit of Dr. Thompson to produce a revisionist history that contradicts Dr. Thompson's prior testimony and lacks any evidentiary support. For these reasons, and the reasons stated in Defendant's original papers, Defendant respectfully requests the preclusion of Dr. Thompson's expert opinions and reports.

Dated: New York, New York
March 12, 2025

                                                  Respectfully submitted,

                                                */s/ Richard Bahrenburg*
                                                Richard Bahrenburg, Esq.
                                                FORDHARRISON LLP
                                                366 Madison Avenue, 7th Floor
                                                New York, New York 10017
                                                212-453-5900
                                                rbahrenburg@fordharrison.com
                                                *Attorneys for Defendant*