UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____ X

TERRENCE SAMPSON,

     Plaintiff,

   v.

        **REPORT & RECOMMENDATION**

         19-cv-04946 (DG) (LKE),
         22-cv-03588 (DG) (LKE)

INTERNATIONAL UNION OF OPERATING
ENGINEERS LOCAL 14-14B,

     Defendant.
_____ X

**LARA K. ESHKENAZI, United States Magistrate Judge:**

Defendant International Union of Operating Engineers Local 14 and 14(B) ("the Union")

brings this motion seeking summary judgment to dismiss Plaintiff Terrence Sampson's

Complaints. (ECFs 1, 127-131.)[1] Plaintiff's claims stem from his membership in the Union and

his use of the Union's referral hall system, which he alleges discriminated against him in violation

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*, and the New York City

Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101, *et seq*. (19-cv-4946, ECF 1; 22-

cv-3588, ECF 1.) Plaintiff opposes the instant Motion for Summary Judgment. (*See* Def. Mot.

Summary J., ECF 127; Pl. Mem. Opp., ECF 129.)

---

[1] At issue are two Complaints filed by Plaintiff on separate dockets. First, Plaintiff brought 19-cv-4946, which asserts causes of action for racial discrimination and retaliation for filing a discrimination charge with United States Equal Employment Opportunity Commission ("EEOC"). (19-cv-4946, ECF 1.) Plaintiff later brought 22-cv-3588, asserting the same claims as 19-cv-4946 with the addition of a claim of retaliation as a result of his filing 19-cv-4946. (22-cv-3588, ECF 1.) As the motions submitted in both dockets are identical, all ECF citations reflect ECF entries as they appear in 19-cv-4946 unless otherwise specified.

For the reasons set forth below, this Court respectfully recommends (1) granting Defendant's motion for summary judgment as to Plaintiff's claim of discrimination; and (2) denying Defendant's motion for summary judgment as to Plaintiff's claim of retaliation.

## I.    BACKGROUND

### A.    Factual Allegations

The following facts are drawn from the parties' statements of material facts submitted pursuant to Local Civil Rule 56.1 ("Def. 56.1 Statement" and "Pl. 56.1 Statement") (ECFs 88-1, 95) and the affidavits and exhibits submitted in connection with the motion (ECFs 127-131). The below facts are undisputed unless otherwise indicated.

The Union represents operating engineers in the construction industry, a position entailing the operation of heavy machinery including cranes, excavators, and welding machines. (Def. 56.1 Statement ¶¶ 33-34, 73.)[2] The Union is comprised of two separate branches: Local 14, members of which must have a New York City Hoist Machine Operator ("HMO") crane license, and Local 14B, whose members do not have an HMO license. (*Id.* ¶ 35.) Plaintiff became a member of Local 14B in 2010, as he did not hold either class of HMO license required to join Local 14. (*Id.* ¶¶ 65-67.) Prior to joining the Union, Plaintiff attended the Union's training school. (*Id.* ¶ 68.) He holds the following certifications: eight-hour fall prevention, two-hour drug and alcohol awareness, ten-hour OSHA card, OSHA forklift, NYC scaffolding, and FDNY air compressor. (*Id.* ¶ 71.) Although Plaintiff's certifications correlate to lower rates of pay than other certifications, he has not obtained training on, maintained, or acquired the necessary skills to operate equipment used in jobs for which Local 14 refers members. (*Id.* ¶ 70; Pl. 56.1 Statement ¶ 70.)

---

[2] Where a fact is undisputed, the Court cites exclusively to Defendant's Rule 56.1 Statement for convenience.

The Union operates a referral hall through which its members may seek a referral to jobs for which they are eligible. (Def. 56.1 Statement ¶ 38.) Referrals are done via a formal referral system that the Union has amended several times since 2010. (*Id.* ¶¶ 39-42.) Contractors may call the Union business agents' office at the referral hall to inform the business agents of any jobsites in need of workers. (*Id.* ¶ 45.) Outside of the Union's referral system, contractors are allowed to hire engineers individually and engineers are allowed to seek out work opportunities on their own. (*Id.* ¶ 47.) The parties dispute how common it is for engineers to obtain jobs from outside of the Union referral hall, and similarly dispute whether it is typical for contractors to hire engineers from within their own networks instead of through the Union. (*Compare* Def. 56.1 Statement ¶¶ 48, 49 (asserting that "contractors typically seek out people in their network," that "[m]ost operating engineers obtain jobs by means other than the referral hall," and that "the referral hall only gets busy when the industry is overloaded"), *with* Pl. 56.1 Statement ¶¶ 48, 49 (arguing that Defendant's job database "indicates that fewer than 20 percent of the jobs are obtained by members on their own").)

Under the Union's current referral system, the referral hall opens at about 6:00 a.m. and closes at or around 10:00 a.m. (Def. 56.1 Statement ¶¶ 52, 64.) Upon arrival, members seeking work sign into a computer system, which generates a randomized list of the members who signed in between 6:00 a.m., when the hall opened, and about 6:10 a.m., or whenever the first round of members to arrive have finished signing in. (*Id.* ¶¶ 52, 53.) Members are then referred to jobs based on the order in which they appear on the randomized list, provided that they have "the relevant skills, licensing, certifications, or qualifications necessary to perform the work." (*Id.* ¶ 54.) Under the previous referral system, members were referred jobs in the order in which they signed onto the computer system after arriving at the referral hall in the morning, also provided that they had

"the relevant skills, licensing, certifications, or qualifications necessary to perform the work." (*Id.* ¶ 55.) The changes to the system were made to address the issue of members spending the night in their cars to be first in line in the morning. (*Id.* ¶ 56; *see also* Pl. 56.1 Statement ¶ 56 (agreeing that some members would wait overnight in their cars to gain an advantage but asserting that "[t]he motive for the change is subject to question").)

Plaintiff and Defendant dispute whether the referral hall business agents skip or ignore qualified members on the randomized list. (*Compare* Def. 56.1 Statement ¶ 57 ("business agents…do not skip over or ignore qualified people on the randomized list"), *with* Pl. 56.1 Statement ¶ 57 (asserting that "Defendant's database shows that jobs are referred to members who are not in the hall even though qualified people are in the hall," and that the Union never audited or investigated whether the referral rules were being followed).) After receiving a referral, members receive a referral slip for the referred job. (Def. 56.1 Statement ¶ 58.) The slip does not reference how long a job will last, and business agents often do not know, and therefore cannot tell members, a job's duration. (*Id.*) The Union maintains a detailed work report for each member, listing the jobs to which they were referred each year and whether the member either refused or skipped each referral. (*Id.* ¶¶ 59-63; *see also* Pl. 56.1 Statement ¶ 60 (noting that "[a] business agent can enter that a member refused a job, whether [or not] the member in fact refused a job, or a business agent can omit to enter that a member refused a job").) If a member refuses a referral, the Union records the member's reason for doing so. (Def. 56.1 Statement ¶ 63.) A member is listed as having "skipped" a job if the member either does not have the license necessary for a piece of equipment or does not answer their phone after multiple attempts to call them for the referral. (*Id.* ¶¶ 61-62.)

4

The referral hall has referred Plaintiff to operate compressors, welding machines, four-post hoists, alimaks, forklifts, house cars, and backhoes, among others. (*Id.* ¶ 73; *see also* Pl. 56.1 Statement ¶ 73 (asserting that, per Defendant's database, Plaintiff has also been referred to operate hoists, concrete plants, drills, excavators, fire proofers, grout pumps, jacking systems, locomotives, lulls, pumps, rack and pinions, rock crushers, spreaders, welding machine and well pts)).) Plaintiff has been referred to some jobs lasting over one year. (Def. 56.1 Statement ¶ 80.) During his time using the referral hall, Plaintiff has refused various referrals and has rescinded acceptances of referrals, but has never disputed his position on the referral list. (*Id.* ¶¶ 82-88.) Various construction projects and companies have terminated Plaintiff or asked that he not be referred to their projects due to Plaintiff's unsafe or ineffective work. (*Id.* ¶¶ 89-94; *but see* Pl. 56.1 Statement ¶¶ 89-94 (asserting that evidence of companies asking that Plaintiff not be referred are hearsay and not authenticated, and disputing the substance of several such letters requesting Plaintiff be barred from certain projects).) Plaintiff has stated that he does not know how many Union members are people of color. (Def. 56.1 Statement ¶ 96.) Plaintiff cannot name any "members who were referred to jobs to which they should not have been referred from 2014-2022;" "cannot name any business agents who referred members to jobs Plaintiff believes he should have gotten;" and "cannot list any jobs he believes he should have gotten or name which [U]nion members got any such job in his stead." (*Id.* ¶¶ 100-102.) Plaintiff is not aware of "any instance in which a member has been instructed to quit a job in order to receive a new referral," and states that he has never read the Union bylaws or seen the Referral System Procedures. (*Id.* ¶¶ 109, 120-121.)

### B.    **Procedural History**

Plaintiff filed a discrimination charge with the EEOC on June 22, 2017. (Def. 56.1 Statement ¶ 1.) The EEOC mailed Plaintiff a Right to Sue letter on July 26, 2019. (*Id.* ¶ 2.) Plaintiff

5

filed a Complaint in his first matter, No. 19-cv-4946, on August 29, 2019. (ECF 1.) Defendant

waived service on October 15, 2019, and answered on November 4, 2019. (ECFs 7, 8.)

Plaintiff filed a Complaint in his second matter, No. 22-cv-3588, on June 17, 2022. (No.

22-cv-3588, ECF 1.) Defendant waived service on August 2, 2022, and responded by filing a

motion for pre-motion conference in anticipation of the filing of a motion to dismiss on September

19, 2022. (No. 22-cv-3588, Aug. 2, 2022, Waiver of Service; No. 22-cv-3588, Letter Mot. for Pre-

Mot. Conference, ECF 6.) Defendant filed a fully briefed Motion to Dismiss on January 27, 2023.

(No. 22-cv-3588, ECFs 12-16.) Then Magistrate Judge Ramon Reyes issued a Report and

Recommendation recommending denial of Defendant's Motion to Dismiss on July 10, 2023 (No.

22-cv-3588, ECF 17), and the Union objected on July 24, 2023 (No. 22-cv-3588, ECF 19). Plaintiff

opposed the Union's objection, and the Honorable Diane Gujarati adopted the Report and

Recommendation on August 14, 2023. (No. 22-cv-3588, August 14, 2023, Order Adopting R. &

R.)

On March 14, 2025, Defendant filed a *Daubert* motion on both dockets, which Plaintiff

then opposed. (No. 19-cv-4946, ECFs 108-115; No. 22-cv-3588, ECFs 66-73.) Judge Gujarati

denied Defendant's motion from the bench. (June 30, 2025, Min. Entry (both dockets).) Defendant

submitted a motion for reconsideration on July 14, 2025, and Plaintiff submitted an opposition on

July 21, 2025. (No. 19-cv-4946, ECFs 118-120; No. 22-cv-3588, ECFs 76-78.) Judge Gujarati

issued a Memorandum and Order denying Defendant's motion for reconsideration. (Mem. &

Order, ECF 80.)

In November of 2025, both parties submitted briefing on the instant Motion for Summary

Judgment. (No. 19-cv-4946, ECFs 127-131; No. 22-cv-3588, ECFs 85-89.) Judge Gujarati referred

6

the Motion to this Court for a Report and Recommendation on December 16, 2025. (Dec. 16, 2025, Order Referring Mot. (both dockets).)

## II.      LEGAL STANDARDS

### A.      Summary Judgment

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020).

> There is 'no genuine dispute as to any material fact' where (1) the parties agree on all facts …; (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts … ; or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law….

*Lange v. Dep't of Educ.*, No. 17-cv-3443, 2018 WL 4636986, at *2 (S.D.N.Y. Sept. 26, 2018) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a fact is genuinely disputed, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996); *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995) (explaining that a court's responsibility in assessing the merits of a summary judgment motion is not to try issues of fact, but merely to "determine whether there

7

*are* issues of fact to be tried" (emphasis in original) (quoting *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir. 1984))).

## B.    Standing

At the outset, Plaintiff must establish standing under Article III of the U.S. Constitution. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411-12 (2013) ("The party invoking federal jurisdiction bears the burden of establishing standing – and, at the summary judgment stage, such a party can no longer rest on … mere allegations, but must set forth by affidavit or other evidence specific facts." (internal quotations omitted) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992))). To do so, Plaintiff must show "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likely[hood] that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (internal quotations omitted) (citing *Lujan*, 504 U.S. at 560-61).

## C.    Discrimination

"In analyzing whether a plaintiff has sufficiently alleged an employment discrimination claim, the Court must consider … the three-stage, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Richard v. N.Y.C. Dep't of Educ.*, No. 16-cv-957 (MKB), 2017 WL 1232498, at *5 (E.D.N.Y. Mar. 31, 2017). Under the *McDonnell Douglas* test, a plaintiff must first establish a *prima facie* case of discrimination by showing that: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *McDonnell Douglas*, 411 U.S. at 802).

Once a plaintiff establishes a *prima facie* case, a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981). The burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the disparate treatment. *McDonnell Douglas*, 411 U.S. at 802. If the employer articulates such a reason for its actions, the burden in Title VII cases shifts back to the plaintiff to prove that the employer's reason "was in fact pretext" for discrimination. *Vega*, 801 F.3d at 83 (citing *McDonnell Douglas*, 411 U.S. at 804); *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) ("If such a reason is proffered, the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action."). In NYCHRL cases, "the plaintiff may defeat the defendant's evidence of legitimate reasons for the challenged action by coming forward with evidence from which it could be found that 'unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for [the] adverse employment decision.'" *Hamburg v. N.Y. Univ. Sch. Of Med.*, 155 A.D.3d 66, 73 (N.Y. App. Div. 2017) (quoting *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 127 (N.Y. App. Div. 2012)).

### D.   Retaliation

Retaliation claims under both Title VII and the NYCHRL are analyzed under the same burden-shifting test as discrimination claims. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) ("The burden-shifting framework laid out in *McDonnell Douglas* … governs retaliation claims under both Title VII and [New York state law]."); *see also Forrest v. Jewish Guild for the Blind*, 819 N.E.2d 998, 1012 (N.Y. 2004) (noting that the same standard applies for retaliation claims under New York State and City human rights laws). To establish a *prima facie* claim of retaliation, a plaintiff must show that "(1) he participated in a protected activity; (2) the defendant

9

was aware of his protected activity; (3) he suffered an 'adverse employment action;' and (4) there is a causal connection between the protected activity and the adverse employment action." *Murphy v. AutoZone, LLC*, No. 22-cv-00911 (OEM) (VMS), 2024 WL 3401199, at *11 (E.D.N.Y. July 12, 2024) (quoting *Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 844 (2d Cir. 2013)).

A plaintiff may establish a causal connection "by showing that the protected activity was followed closely by the discriminatory treatment." *Id.* at *12 (quoting *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010)). "An employee engaged in a 'protected activity' 'need not establish that the conduct he opposed was in fact a violation of Title VII, but rather, only that he had a good faith, reasonable belief that the underlying employment practice was unlawful.'" *Dingle v. Riverbay Corp.*, No. 21-cv-1349, 2024 WL 1348491, at *8 (S.D.N.Y. Mar. 29, 2024) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)). "A mere mention of feeling 'discriminated against' is not enough to put an employer on notice of a protected complaint if 'nothing in the substance of the complaint suggests that the complained-of activity is, in fact, unlawfully discriminatory.'" *Moore v. N.Y.C*, 745 F. App'x 407, 409 (2d Cir. 2018) (quoting *Kelly v Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 17 (2d Cir. 2013)).

## III.   ANALYSIS

### A.   Standing

Defendant argues that Plaintiff "fails to establish" standing to sue because Plaintiff cannot show that he has suffered an injury in fact, cannot trace any claimed injury to the Union, and cannot show that his alleged injury could be redressed by a favorable court decision. (Def. Mem. L. at 9-13, ECF 128.) Plaintiff counters that Defendant's "entire standing argument rests on its assertions that [P]laintiff cannot prove his case on the merits." (Pl. Mem. Opp. at 11, ECF 129.)

10

Article III standing requires a plaintiff to show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Importantly, "[t]he issue of standing is distinct from whether a plaintiff has a cause of action." *Ortiz v. Pace Univ.*, 761 F. Supp. 3d 695, 700 (S.D.N.Y. 2025) (citing *Toretto v. Donnelley Fin. Sols., Inc.*, 523 F. Supp. 3d 464, 473 (S.D.N.Y. 2021), *abrogated on other grounds by DirecTV, LLC, v. Nexstar Media Grp., Inc.*, 162 F.4th 295 (2d Cir. 2025)). "While the pleading of a cause of action must possess enough heft to show that the pleader is entitled to relief, to plead standing, the pleader need only show that allowing her to raise her claim in federal court would not move so beyond the court's ken as to usurp the power of the political branches." *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 111-12 (2d Cir. 2018) (internal citation and quotation marks omitted). "Unless an allegation of injury is so insubstantial … as not to involve a federal controversy, the mere fact that it raises a federal question … confers power [on a federal court] to decide that it has no merit, as well as to decide that it has." *Id.* at 12 (internal citations and quotations omitted). In sum, "[s]tanding does not turn on whether a plaintiff has definitively stated a valid cause of action." *DiCocco v. Garland,* 52 F.4th 588, 591 (4th Cir. 2022).

Here, Plaintiff alleges that he has a concrete, particularized, legally-protected employment interest in seeking employment without discrimination based on his race. (Pl. Mem. Opp. at 11.) He further asserts that this interest was infringed upon by discrimination in the referral process, requiring him to attend the referral hall more frequently for fewer employment opportunities. (*Id.*; Pl. 56.1 Statement ¶ 164); *see Franza v. Int'l Broth. of Teamsters, Loc. 671*, 869 F.2d 41, 47-48 (2d Cir. 1989) ("An equal right to jobs allocated by the union referral system is clearly an incident of union membership."). These allegations are sufficient to establish an injury in fact and

11

traceability between his "injury and the conduct complained of," satisfying the causation requirement. *See DiCocco*, 52 F.4th at 592 (finding plaintiff's injury traceable where her lack of employment was caused by defendant employer's policies); *Lujan*, 504 U.S. at 560-61. Finally, an award of damages would redress Plaintiff's injury. (*See* Pl. Mem. Opp. at 11 ("An award of damages would satisfy [the redressability] requirement, because it would compensate [P]laintiff for the injuries suffered.").)

Accordingly, the Court respectfully recommends finding that Plaintiff has satisfied the requirements of Article III standing.

### B. *Prima Facie* Discrimination

The Court now turns to Plaintiff's claims of discrimination. Under both Title VII and the NYCHRL, Plaintiff must first establish a *prima facie* case of discrimination by showing that "(1) [he] belongs to a protected class; (2) [he] was qualified for the position in question; (3) [he] suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of [] discrimination." *Cherry v. N.Y.C. Housing Auth.*, 564 F.Supp.3d 140, 165 (E.D.N.Y. 2021) (internal citation and quotations omitted). The parties do not appear to dispute that Plaintiff's race places him in a protected class. (*See* ECF 1 ¶ 4.)

Defendant argues that Plaintiff fails to establish a *prima facie* case because (1) he cannot show that he was qualified for any specific position, (2) he cannot show that he suffered any specific adverse employment action, and (3) he cannot show circumstances giving rise to an inference of discrimination. (Def. Mem. L. at 15-18.) Plaintiff counters that his "case is not about individual job referrals" and that his analysis of "the referrals for which he was qualified shows that race was a factor in those referrals." (Pl. Mem. Opp. at 14-15.)

12

### 1.    Plaintiff's Qualification for Referrals

According to Defendant, Plaintiff cannot show that he "was qualified for any job he claims he was not referred to, since he does not even know what those jobs are or who they allegedly went to." (Def. Mem. L. at 15.) Plaintiff claims that, of the referral data he analyzed, "Plaintiff was qualified for all the job referrals in question, because he compared himself only against other members with the same or lesser qualifications." (Pl. Mem. Opp. at 14.)

The Court finds Plaintiff's data to be insufficient to establish his qualifications for referrals he did not receive. As an initial matter, assuming Plaintiff has sufficiently demonstrated that he held the specific certifications necessary for all the positions in question, the record before the Court does not establish whether those job referrals include referrals to companies or contractors that had previously informed the Union not to refer Plaintiff to any of their jobs. (*See* Def. 56.1 Statement ¶¶ 89-94.) Moreover, assuming Plaintiff's analysis measured any disparity between himself and White members who had also been banned from working with the same several companies or contractors for workplace-safety or quality of work concerns, Plaintiff does not identify any specific job referrals he was qualified for but did not receive out of the pool of jobs for which Plaintiff could generally have been qualified for had they been referred to him. (*See* Def. 56.1 Statement ¶¶ 99, 101-103, 106, 108; *see also* Pl. 56.1 Statement ¶¶ 99, 101-103, 106, 108 (concurring with Def. 56.1 Statement ¶¶ 99, 101-103, 106, and 108)); *see also Dimitropoulos v. Painters Union Dist. Council 9*, 893 F. Supp. 297, 300 (S.D.N.Y 1995) ("Plaintiff neither states which jobs he was excluded from nor asserts that he was qualified for these unspecified jobs."). As such, the Court respectfully recommends finding that Plaintiff has failed to plead sufficient facts to lead a reasonable juror to conclude that he was qualified for the jobs he alleges should have been referred to him.

### 2.     Adverse Employment Action

Even if the Court finds that Plaintiff has provided sufficient evidence of his qualifications for the jobs that were not referred to him, Plaintiff must still establish that he suffered an adverse employment action by having to visit the referral hall more frequently in order to receive the number of referrals necessary to make a living, never being referred to a hoist job, and receiving a "disproportionately high number of assignments to lower paying jobs." (Pl. Mem. Opp. at 16-17.) Defendant argues that, in order to find that he suffered an adverse action, a jury would need to find that Plaintiff "was not referred to a 'desirable' job (by Plaintiff's own definition) without any evidence of (1) a single instance where that actually occurred, (2) what exactly that job was, (3) who was ultimately referred to that job, or (4) what that job paid." (Def. Mem. L. at 15-16.)

Plaintiff's evidence is largely premised on a statistical analysis performed by Dr. Shane Thompson, a forensic labor economist. (Def. Mot. for Pre-Mot. Conference, Ex. O, ECF 88-17.) Dr. Thompson's analysis purports to show that (1) Black and Hispanic workers visited the union hall statistically significantly more times than their White counterparts; (2) White engineers with equal or lesser qualifications to Plaintiff had to make 2.3 visits to get 1,000 work hours, while Black engineers had to make 9.5 visits; (3) Black engineers make up 7.5% of the population of engineers but are assigned to 28.2% of the locomotive tunnel jobs, an undesirable assignment; and (4) Black engineers are over-assigned to low-paying jobs and under-assigned to high paying jobs to a statistically significant degree. (*Id.* ¶ 7, ECF 88-17.) Dr. Thompson also concludes that "Mr. Sampson was an extreme outlier among his peers, making far more visits to the union hall, getting far fewer hours, and receiving inordinate assignments to lower-paying jobs." (*Id.* ¶ 8.)

Dr. Thompson specifically acknowledges, however, that "[h]oist jobs," a high paying referral, "required a certification that Mr. Sampson (and his equal or lesser qualified peers) did not

14

have." (*Id*. ¶ 44.) Although Dr. Thompson states that "[e]xceptions could be made … if nobody else was available[,]" he offers no basis for this assertion or any statistical analysis of how often such exceptions were made, and whether the disparity in race in referrals of hoist positions was due to race or the fact that certain union members, like Plaintiff, did not hold the appropriate certification. (*See generally id.*) The lack of any specific information on whether other members without the appropriate certification received referrals for hoist positions, and whether more "exceptions" to the required certification were made for White engineers than Black engineers, undercuts Plaintiff's assertion that he suffered an adverse employment action by not being referred to any hoist positions. (*Id.*)

Next, Plaintiff's contention that he had to visit the referral hall more often and that he received a disproportionate number of low-paying referrals suffers when faced with Plaintiff's history of turning down or skipping job referrals. Ultimately, Plaintiff "refused, rejected, ignored, failed to show up for, or lacked the skills and qualifications for" hundreds of referral opportunities. (Def. Mem. L. at 16; *see* Def. 56.1 Statement ¶¶ 83-88, 99, 102, 106, 108.) In other cases within the Second Circuit, plaintiffs who had refused multiple job offers that they found undesirable or, more egregiously, were not contacted by their union to inform them of employment opportunities, were found not to have established *prima facie* cases of discrimination. *Blandon v. Teamsters Loc. Union No. 443*, No. 10-cv-0463, 2011 WL 4915197, at *10 (D. Conn. Oct. 17, 2011) (finding that plaintiff's failure to "present[] any evidence that [the defendant's] failure to contact [him] to inform him of employment opportunities deprived him o[f] any specific job opportunities" was insufficient to support *prima facie* discrimination); *Talwar v. Connecticut*, 539 F. Supp. 2d 604 (D. Conn. 2008), *as amended* (Mar. 31, 2008) (finding that plaintiff did not establish *prima facie*

discrimination in refusing to offer plaintiff jobs because plaintiff was offered and refused multiple jobs).

The Court thus respectfully recommends concluding that Plaintiff has not shown that he suffered an adverse employment action.

### 3.    Inference of Discrimination

Finally, even if the Court concludes that Plaintiff was qualified for the job referrals and that he has suffered an adverse employment action, Plaintiff's claim of discrimination still fails because Plaintiff has not established sufficient evidence to support an inference of discrimination under either Title VII or the NYCHRL.

Plaintiff's case depends largely on Dr. Thompson's statistical analysis purporting to show "discrimination, both against Blacks in general and against plaintiff specifically." (Pl. Mem. Opp. at 16; *see* Def. Mot. for Pre-Mot. Conference, Ex. O ¶ 7 (noting statistically significant disparities between White and Black union members and finding that Mr. Sampson had to make more visits to obtain work than other union members).) "Statistics standing alone," however, do not create a case for disparate treatment, *see Hudson v. Int'l Bus. Machs. Corp.*, 620 F.2d 351, 355 (2d Cir. 1980), and Plaintiff does not provide evidence of a single instance in which he was personally discriminated against by the Union, (*see generally* Pl. Mem. Opp.). Without any such evidence, Plaintiff cannot show that he was the victim of disparate treatment discrimination. *See Dimitropoulos*, 893 F. Supp. at 300 n.1 (dismissing plaintiff's discriminatory job referral claim where he did not "produce any evidence showing that he was by-passed in a manner not permitted by the Union regulations … c[ould] not identify any of these younger workers … or state whether or not they signed the 'out-of-work book'[,] and is unable to state the nature of the referred work"); *Collier v. Plumbers Union Loc. No. 1 of United Ass'n of Journeymen & Apprentices of Plumbing*

16

*& Fitting Indus. of U.S & Canada*, No. 05-cv-2191 (JG), 2007 WL 1673047, at \*3 (E.D.N.Y. June 7, 2007) (holding that plaintiff could not establish *prima facie* elements for her discriminatory referral claim where she "received relatively few jobs compared to the union average, and was '[o]ften times' referred to sub-par temporary [] jobs"); *MacAlister v. Millennium Hotels & Resorts*, No. 17-cv-6189, 2018 WL 5886440, \*6-8 (S.D.N.Y. Nov. 8, 2018) (dismissing discrimination claim where plaintiff "d[id] not allege any additional facts distinguishing her experience from that of her colleagues" and "[did] not provide any information about any other employee, never mind any similarly situated employee, which does not allow this Court to draw an inference that there was favorable treatment of other employees outside of her protected status"). In light of Plaintiff's failure to identify any referral given to a White union member that should have gone to him or any other similar specific instance of discrimination, Plaintiff also fails to meet the requirements of the NYCHRL, which allows this element to be met "so long as a member of a protected class was treated differently than a worker who was not a member of that protected class." *See Cherry*, 564 F. Supp. 3d at 194.

Moreover, while Dr. Thompson concludes that Plaintiff is an "extreme outlier" in the high number of visits he paid to the referral hall, the low number of work hours logged, and assignments to lower-paying jobs, as discussed above, the analysis does not account for the number of jobs Plaintiff either skipped or turned down. (Def. Mot. for Pre-Mot. Conference, Ex. O ¶ 8.) This omission in the statistical analysis is significant. As Defendant points out, if Plaintiff skipped or otherwise turned down many of the referrals he was given, it follows that "Mr. Sampson had to make over 40 visits to the union hall to get 1,000 hours of work." (*Id.* ¶ 36; *see* Def. Mem. L. at 6 ("Plaintiff has refused, rescinded acceptance for, or been skipped for hundreds of job referrals." (emphasis omitted)); *see also* Def. 56.1 Statement ¶¶ 83-88.) Similarly, Dr. Thompson's analysis

17

does not account for certain contractors requesting that the Union no longer refer Plaintiff to work for them. (*See* Def. 56.1 Statement ¶¶ 89-94.) Both of these factors—the skipped or turned down referrals and the contractors that would not accept Plaintiff—provide nondiscriminatory explanations for Plaintiff's lower referral numbers. (Def. 56.1 Statement ¶¶ 89-94.)

As Plaintiff admits, "[o]n any given day, being in the right place at the right time can make all the difference in terms of getting a referral, the type of machine or equipment to be operated (thus the pay rate), and the length of the job. It is a role of the dice." (Pl. Mem. Opp. at 16.) While Plaintiff may not have been in the right place at the right time, he has not established evidence giving rise to an inference of discrimination. As such, the Court respectfully recommends that Plaintiff has failed to demonstrate a sufficient dispute of material fact to prevent his discrimination claim from being dismissed.[3]

## C.    *Prima Facie* Retaliation and Defendant's Non-Retaliatory Rationale

To succeed on his claim of retaliation, Plaintiff must demonstrate that Defendant "discriminated – or took an adverse employment action – against the plaintiff and that the adverse action would not have occurred in the absence of the retaliatory motive." *Zheng-Smith v. Nassau Health Care Corp.*, No. 20-3544, 2021 WL 4097316, at *3 (2d Cir. Sept. 9, 2021) (cleaned up).

Plaintiff alleges that his hours decreased significantly after he filed his Complaint in 19-cv-4946 in 2019. (Pl. Mem. Opp. at 19.) In support of his retaliation claim, Plaintiff submits a second report by Dr. Thompson in which Dr. Thompson examined the Union's post-2019 randomized referral system and concluded that "union hall assignments are still *not* random."

---

[3] Because Plaintiff has failed to establish a *prima facie* case of discrimination, the Court need not consider whether Defendant has articulated a legitimate, nondiscriminatory reason for the disparate treatment. *See McDonnell Douglas*, 411 U.S. at 802. Even if the Court were to find, however, that Plaintiff has established a *prima facie* case of discrimination sufficient to shift the burden to Defendant, as discussed above, Defendant has articulated nondiscriminatory reasons for Plaintiff's lower referral numbers. *See supra* III.B.3 (discussing the skipped referrals and the refusal of certain contractors to accept Plaintiff).

((Def. Mot. For Pre-Mot. Conference Ex. Q ¶ 10, ECF 88-19 (emphasis in original).) He again measured the change in Plaintiff's referred work hours by how many visits to the hall it took in order for him to be referred to the number of jobs sufficient to receive the hours worked. According to Dr. Thompson, in 2018, in order to be referred to 1,000 hours of work, Plaintiff would have had to visit the referral hall approximately 68.5 times. (*Id.* ¶ 9.) In 2023, if plaintiff were to receive 1,000 hours of referred work, he would need to visit the hall approximately 604.8 times. (*Id.*) Dr. Thomson further noted that as the referral hall only opens for referral once per day, at the 2023 rate it would be impossible for Plaintiff to receive 1,000 hours of referred work. (*See id.*; *see also* Pl. 56.1 Statement ¶¶ 52-53.) In 2018, the number of hours Plaintiff worked reached its peak of 1,680. (Pl. Mem. Opp. at 7 (citing Def. Mot for Pre-Mot. Conference Ex. Q at 5).) By 2020, his hours had dropped to 896, and by 2023, his hours plummeted to 248. (*Id.*)

The first element of a retaliation claim, participation in a protected activity, "includes opposing an unlawful employment practice or otherwise making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing." *Mitchell v. Planned Parenthood of Greater N.Y., Inc.*, 745 F. Supp. 3d 68, 97 (S.D.N.Y. 2024) (citation omitted). "In other words, an employer cannot retaliate on account of an employee's having opposed, complained of, or sought remedies for, unlawful workplace discrimination." *Id.* (quoting *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 842 (2d Cir. 2022)). Defendant does not dispute that Plaintiff's 2019 lawsuit constitutes protected activity sufficient to satisfy the first element. (No. 22-cv-3588 Compl. ¶ 58 (alleging retaliation against Plaintiff for 2019 suit); Def. Mem. L. at 18-21 (failing to dispute that 2019 lawsuit was protected activity).) Likewise, there is no dispute that Defendant was aware of Plaintiff's suit, thus satisfying the second element of a prima facie retaliation case. (*See* No. 19-cv-4946, Waiver of Service, ECF 7); *see also Zann Kwan*, 737 F.3d at 844 ("[F]or

19

purposes of a prima facie case, a plaintiff may rely on 'general corporate knowledge' of h[is] protected activity to establish the knowledge prong []." (*quoting Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000))).

Turning to steps three and four of the retaliation analysis, the parties dispute whether Plaintiff's decreased hours are due to an adverse action taken by Defendant. *See Murphy*, 2024 WL 3401199, at *11 (listing elements of retaliation claim). There is no dispute, however, that Plaintiff's hours decreased significantly after he filed his initial discrimination lawsuit in 2019. (Def. Mem. L. at 19 (noting that Plaintiff's retaliation claim stems from the assertion that "because his total hours worked per year dropped, he must have been retaliated against"); Pl. Mem. Opp. at 19 ("a reasonable juror could infer that [the] dramatic drop in hours [worked] was in retaliation for [P]laintiff's 2019 lawsuit.").) Defendant argues that, because Plaintiff "is unable to identify a single specific act of retaliation[,]" he "fails to establish any adverse employment action" sufficient to support his claim of retaliation. (Def. Mem. L. at 20.) Defendant also notes that Dr. Thompson "did not control for COVID and its effects on work opportunities in the construction industry" in writing his second report. (Def. 56.1 Statement ¶ 28.) Plaintiff counters that that the "radical[]" decline in Plaintiff's referrals from 1,155 hours in 2019 to 248 hours in 2023 "scream[s] retaliation." (Pl. Mem. Opp. at 19.)

In support of its position, Defendant relies on *Attenborough v. Costr. & Gen. Bldg. Laborers' Loc. 79*, 691 F. Supp. 2d 372, 389-90 (S.D.N.Y. 2009), a case in which a court rejected a claim for "retaliatory union referral practices." (Def. Mem. L. at 19.) In *Attenborough*, one of the plaintiffs' claims for retribution failed to survive summary judgment because, although the work hours he was referred by his Union dropped significantly after he filed his EEOC claim, the plaintiff could not identify another union member below him on the referral list who was referred

20

to a job he would have taken and failed to address the "undisputed" evidence that, after the filing of his EEOC claim, the plaintiff began refusing significant portions of the work referred to him, ignored referrals to jobs offering significant work hours, and allowed his referral registration to lapse at least twice. 691 F. Supp. 2d at 389-91. While Defendant is correct that, like in *Attenborough*, Plaintiff does not identify any "single specific act of retaliation," the comparison otherwise falls short. (Def. Mem. L. at 20). For example, unlike the plaintiff in *Attenborough*, there is no evidence as to when Plaintiff began refusing or failing to answer the phone for referrals. (Pl. 56.1 Statement ¶¶ 83-88, 111 (agreeing that Plaintiff has rescinded acceptances of, refused, or ignored multiple referrals with no reference to when Plaintiff's rescinded acceptances, refusals, or ignored referrals began).) In fact, Defendant references documentation of Plaintiff's refusal of various referrals from 2014-2019, before he filed his initial lawsuit. (Def. 56.1 Statement ¶ 111.) If Plaintiff had been skipping or refusing referrals throughout his Union membership as Defendant claims, without additional evidence that he skipped or refused significantly more referrals after he filed his initial lawsuit, Plaintiff's conduct cannot explain the drastic change in his referred work hours following the filing of his 2019 lawsuit. (*See* Pl. 56.1 Statement ¶ 111.) Nor can the drop in Plaintiff's referred work hours after 2019 be explained by the refusal of some contractors to hire Plaintiff back, as the contractor refusals listed by Defendant took place between 2009 and 2018. (Def. 56.1 Statement ¶¶ 89-94 (listing contractors refusing to hire Plaintiff between 2009 and 2018); No. 19-cv-4946, ECF 1 (Plaintiff's initial Complaint filed on Aug. 29, 2019).) The Court therefore finds that Plaintiff has shown enough evidence to show a genuine dispute of material fact as to whether his decrease in referrals constitutes an adverse employment action.

Regarding the motivation for the adverse employment action, the Second Circuit "ha[s] not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated

to establish a causal relationship between the exercise of a [] right and an allegedly retaliatory action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). "Causation can be established either directly through evidence of retaliatory animus or indirectly by demonstrating that the adverse employment action followed quickly on the heels of the protected activity[.]" *McConkey v. Churchill Sch. & Ctr.*, No. 24-cv-6091, 2025 WL 2062195, at *13 (S.D.N.Y. July 23, 2025). In *Summa*, the Court found a four-month gap between the filing of the plaintiff's lawsuit and the decision to terminate her sufficient to infer causation in establishing a prima facie case of retaliation. 708 F.3d at 128. Other Circuits have found causal connections where adverse employment decisions were made up to five years after the protected activity. *See Munoz v. Sociedad Espanola De Auxilio Mutuo y Beneficiencia De Puerto Rico*, 671 F.3d 49, 56 (1st Cir. 2012). Here, Plaintiff filed his first lawsuit in 2019, and his referred work hours declined until 2023, when his second lawsuit was filed. (Pl. Mem. Opp. at 19.) As such, Plaintiff has shown sufficient evidence to establish that "the combination of reasonably close temporal proximity and the particular context in this case" is "sufficient to allow an inference of causation." *McConkey,* 2025 WL 2062195, at *13 (citing *Summa*, 708 F.3d at 128; and *Siclari v. N.Y.C. Dep't of Educ.*, No. 19-cv-7611, 2020 WL 7028870, at *9 (S.D.N.Y. Nov. 30, 2020)). The Court therefore recommends that there is a dispute of material facts as to whether Plaintiff has established a prima facie case of retaliation under Title VII.

The next stage of the *McDonnell Douglas* balancing test places the burden on the Union to demonstrate that there was a legitimate, non-retaliatory reason for the decrease in Plaintiff's referred hours. *See McDonnell Douglas*, 411 U.S. at 802. Defendant's proffered non-retaliatory reasons, namely that contractors specifically requested not to work with Plaintiff, that Plaintiff did not respond to or rejected referral opportunities, that Plaintiff lacked the skills necessary to receive

22

certain referrals and failed to use resources offered to obtain them, and that Plaintiff's decreased hours coincide with a change in Defendant's referral system, fail to foreclose a reasonable jury's ability to conclude that Plaintiff's decrease in work hours was the result of retaliation. (Def. Mem. L. at 22-23.)

As referenced *supra*, Plaintiff was already barred from referrals to certain contractors by the time that he filed his original suit in 2019 and there is uncertainty as to when Plaintiff's job refusals began. (*See* Pl. 56.1 Statement ¶¶ 83-88, 111, *supra* (agreeing that Plaintiff has rescinded acceptances of, refused, or ignored multiple referrals with no reference to when Plaintiff's rescinded acceptances, refusals, or ignored referrals began).) Defendant's assertion that Plaintiff's decreased hours were the result of Plaintiff lacking certain certifications does not explain the timing of Plaintiff's decreased hours. (Def. Mem. L. at 22.) And although Defendant adjusted its referral system in October 2019 to "a new and more neutral randomized initial sign-in system," a truly neutral sign-in system does not explain the extreme reduction in work hours. (*Id.*)

In sum, drawing all inferences in Plaintiff's favor, he has pleaded sufficient facts to lead a reasonable juror to conclude that the drop in his referred work hours was a result of retaliation by the Union. The Court therefore respectfully recommends finding that Plaintiff's retaliation claim survives summary judgment.

## IV.   **CONCLUSION**

For the foregoing reasons, the Court respectfully recommends (1) granting Defendant's motion for summary judgment as to Plaintiff's claim of discrimination; and (2) denying Defendant's motion for summary judgment as to Plaintiff's claim of retaliation.

A copy of this Report and Recommendation is being served on all parties via ECF. Within 14 days of service, any party may serve and file specific written objections to this Report and

Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). Any requests for an extension of time to file objections shall be directed to Judge Gujarati. If a party fails to object timely to this Report and Recommendation, it waives any right to further judicial review of this decision. *See Miller v. Brightstar Asia, Ltd*., 43 F.4th 112, 120 (2d Cir. 2022).

**SO ORDERED.**

Dated: Brooklyn, New York
      July 8, 2026

                                                  _Lara K. Eshkenazi_
                                                  LARA K. ESHKENAZI
                                                  United States Magistrate Judge